## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

**ZAIDA RIVERA-QUILES**,

    Plaintiff,

    v.

**COMMISSIONER OF SOCIAL
SECURITY**,

    Defendant.

Civil No. 19-2120 (BJM)

## OPINION AND ORDER

    Zaida Rivera-Quiles ("Rivera") seeks review of the Commissioner's finding that she is not disabled and thus not entitled to disability benefits under the Social Security Act (the "Act"). 42 U.S.C. § 423. Rivera contends that the Administrative Law Judge's ("ALJ") residual functional capacity ("RFC")[1] finding and step five non-disability determination were not supported by substantial evidence. ECF Nos. 1, 14. The Commissioner opposed. ECF No. 17. This case is before me on consent of the parties. ECF Nos. 1 at p. 4; 7 at p. 2. After careful review of the administrative record and the briefs on file, and for the reasons set forth below, the Commissioner's decision is **AFFIRMED**.

## STANDARD OF REVIEW

    After reviewing the pleadings and record transcript, the court has "the power to enter a judgment affirming, modifying, or reversing the decision of the Commissioner." 20 U.S.C. § 405(g). The court's review is limited to determining whether the Commissioner and her delegates employed the proper legal standards and found facts upon the proper quantum of evidence. *Manso-Pizarro v. Secretary of Health & Human Services*, 76 F.3d 15, 16 (1st Cir. 1996). The Commissioner's findings of fact are conclusive when supported by substantial evidence, 42 U.S.C. § 405(g), but are not conclusive when derived by ignoring evidence, misapplying the law, or judging matters entrusted to experts. *Nguyen v. Chater*, 172 F.3d 31, 35 (1st Cir. 1999); *Ortiz v. Secretary of Health & Human Services*, 955 F.2d 765, 769 (1st Cir. 1991). "Substantial evidence

---

[1] An individual's residual functional capacity is her ability to do physical and mental work activities on a sustained basis despite limitations from her impairments.  20 C.F.R. § 404.1520(e) and 404.1545(a)(1).

means 'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Visiting Nurse Association Gregoria Auffant, Inc. v. Thompson*, 447 F.3d 68, 72 (1st Cir. 2006) (*quoting Richardson v. Perales*, 402 U.S. 389, 401 (1971)). The court "must affirm the [Commissioner's] resolution, even if the record arguably could justify a different conclusion, so long as it is supported by substantial evidence." *Rodríguez Pagán v. Secretary of Health & Human Services*, 819 F.2d 1, 3 (1st Cir. 1987).

A claimant is disabled under the Act if she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Under the statute, a claimant is unable to engage in any substantial gainful activity when she "is not only unable to do [her] previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A). In determining whether a claimant is disabled, all of the evidence in the record must be considered. 20 C.F.R. § 404.1520(a)(3).

Generally, the Commissioner must employ a five-step evaluation process to decide whether a claimant is disabled. 20 C.F.R. § 404.1520; *see Bowen v. Yuckert*, 482 U.S. 137, 140–42 (1987); *Goodermote v. Secretary of Health & Human Services*, 690 F.2d 5, 6–7 (1st Cir. 1982). In step one, the Commissioner determines whether the claimant is currently engaged in "substantial gainful activity." If so, the claimant is not disabled. 20 C.F.R. § 404.1520(b). At step two, the Commissioner determines whether the claimant has a medically severe impairment or combination of impairments. 20 C.F.R. § 404.1520(c). If not, the disability claim is denied. At step three, the Commissioner must decide whether the claimant's impairment is equivalent to a specific list of impairments contained in the regulations' Appendix 1, which the Commissioner acknowledges are so severe as to preclude substantial gainful activity. 20 C.F.R. § 404.1520(d); 20 C.F.R. § 404, Subpt. P, App. 1. If the claimant's impairment meets or equals one of the listed impairments, she is conclusively presumed to be disabled. If not, the ALJ assesses the claimant's RFC and determines at step four whether the impairments prevent the claimant from doing the work she has performed in the past. If the claimant is able to perform her previous work, she is not disabled. 20 C.F.R. § 404.1520(e). If she cannot perform this work, the fifth and final step asks whether the claimant is able to perform other work available in the national economy in view of her RFC, as

Rivera-Quiles v. Commissioner of Social Security, Civil No. 19-2120 (BJM)                                    3

well as her age, education, and work experience.  If the claimant cannot, then she is entitled to disability benefits. 20 C.F.R. § 404.1520(f).

At steps one through four, the claimant has the burden of proving that she cannot return to her former employment because of the alleged disability.  *Santiago v. Secretary of Health & Human Services*, 944 F.2d 1, 5 (1st Cir. 1991).  Once a claimant has demonstrated a severe impairment that prohibits return to her previous employment, the Commissioner has the burden under step five to prove the existence of other jobs in the national economy that the claimant can perform.  *Ortiz v. Secretary of Health & Human Services*, 890 F.2d 520, 524 (1st Cir. 1989).  Additionally, to be eligible for disability benefits, the claimant must demonstrate that her disability existed prior to the expiration of her insured status, or her date last insured.  *Cruz Rivera v. Secretary of Health & Human Services*, 818 F.2d 96, 97 (1st Cir. 1986).

## BACKGROUND

The following is a summary of the treatment record, consultative opinions, and self-reported symptoms and limitations as contained in the Social Security transcript.

Rivera was born on December 12, 1969, has a bachelor's degree in Business Administration, is unable to communicate in the English language but does so in the Spanish language, and worked as a receptionist/secretary at a doctor's office from January 2004 until she stopped working on August 22, 2014[2] at age 44. Rivera applied for disability insurance benefits, claiming to have been disabled since August 22, 2014 (onset date) at age 44[3] due to major depression, bilateral carpal tunnel syndrome, radiculopathy, migraines, sleep disorder, hypothyroidism, fibromyalgia, osteopenia, osteoarthritis, trapezius myositis (right shoulder), sciatic nerve inflammation, and cervical dorsal lumbar pain. She last met the insured status requirements on December 31, 2019 (date last insured). Social Security Transcript ("Tr.") 56, 68, 166-170, 189, 193, 208, 388-389, 511, 535.

---

[2] Rivera briefly worked from February to June 2015 at another medical office, which the ALJ found to be an "unsuccessful work attempt" and therefore did not disqualify Rivera at step one. Tr. 56.

[3] Rivera was considered to be a younger individual (Tr. 295), and "[i]f you are a younger person (under age 50), we generally do not consider that your age will seriously affect your ability to adjust to other work." 20 C.F.R. 404.1563(c). Rivera mentions at pages 3 and 4 of her memorandum that her age category changed from a "younger person" on her onset date, to a person "closely approaching advanced age" by her date last insured once she turned 50 in December 2019. The age considered is the one "that applies to you during the period for which we must determine if you are disabled," 20 C.F.R. 404.1563(b)-(d), and the claimant must demonstrate that her disability existed prior her date last insured. *Cruz Rivera*, 818 F.2d at 97.

*Treating Physicians - Physical*

**Dr. Ivonne Camacho-Pastor (internal medicine)**

Since 1996, Dr. Camacho treated Rivera for a variety of conditions with medications. Handwritten notes are mostly illegible. Tr. 16-19, 233-270, 695-732, 777-780, 848-858, 877-888, 924-936. Dr. Camacho opined on October 29, 2015, to the SSA's disability determination program that Rivera could not work. Tr. 66, 777-780. Below, a summary of this record.

In August 1996, Rivera suffered from daily occipital headaches, photophobia, and nausea. In November 1996, Rivera also felt burning pain in her right lateral thigh and tenderness in her right hip area. Tr. 236. Notes from 1996 and 1997 indicate that Rivera's blood pressure readings improved. By May 1997, Rivera had no more headaches. Tr. 235-237. In September 1998, Rivera's red blood cell count was low and her mean corpuscular volume was high. Tr. 704. In June 1999, her blood pressure was at 110/80, and in May 2001, at 131/66. Tr. 704-705.

In September 2004, a lumbosacral spine MRI showed central and right paracentral disk protrusion with anular tear at L4-L5 which touched the ventral dural sac, and sacralization of L5. The rest of the disks were preserved and the vertebral bodies were normal. Tr. 270. Notes from 2006 contain diagnostic codes for sciatica and lumbosacral spondylosis. Tr. 241. Dr. Camacho referred Rivera to neurologist Dr. Samuel Méndez in June 2006. Tr. 665. A November 2007 x-ray revealed lumbar spine dextroscoliosis. Tr. 250.

In 2006 and 2007, Rivera's blood pressure was 110/80. Tr. 240-241. Blood work from April 2008, July 2010, May 2012, July 2014, and June 2015 showed high levels of cholesterol and low density lipoprotein. Tr. 233, 248-249, 253, 263, 266. In September 2011, a liver profile metabolic panel blood test, abdominal ultrasound, and hepatobiliary scan were performed. Tr. 245-247, 256. Aspartate aminotransferase (liver enzyme), globulin, white blood cell, and neutrophil counts were flagged as high, and the lymph count as low. Tr. 246-247. The ultrasound revealed cholelithiasis (gallstones) and cortial thinning of the superior pole in the left kidney. Tr. 256. The gallbladder scan revealed chronic acalculous cholecystitis (inflammation). Tr. 245.

A May 2012 lumbar spine MRI showed bulging with disc desiccation at L4-L5, sacralization of L5, and mild degenerative spondylosis. No bony canal stenosis was detected. The rest of the vertebral disks were normal. Tr. 267. In August 2014, a lumbosacral spine MRI showed a disc bulge with a small annular tear at L4-L5, but an "[o]therwise unremarkable MRI of the lumbosacral spine. No significant interval change when compared to MRI of 5/26/12." Alignment

and curvature were normal, and there was no spinal canal stenosis. Tr. 264, 269. In 2015 and 2016, Rivera was diagnosed with shoulder bursitis. Tr. 848, 854, 857-858, 877.

A January 2018 thyroid sonogram showed a mildly enlarged multinodular thyroid gland. Tr. 924, 935. A mammography showed bilateral simple breast cysts, probably benign but required follow-up. Tr. 934. An October 30, 2018, soft tissue sonogram of her right upper inner arm revealed a small superficial lipoma. Tr. 18. An April 2019 thyroid ultrasound was normal. Tr. 17. April 2019 x-rays showed right foot calcaneal spurs. Tr. 16.

**Dr. Roberto García (physiatrist)**

In October 2004, Rivera had low back pain, especially while standing, and was taking medications (Flexeril). Physical therapy was recommended to work on her hip flexion. Tr. 666. In November 2004, Rivera's hip flexion was within normal limits and Rivera reported having less pain in the hips. Tr. 667.

**Dr. Arturo López-Rivera (physiatrist)**

In 2006, Rivera felt pain in her lower back and legs, numbness, a burning sensation in her hips and the back of her thigh, cramps, feet swelling, and had difficulty walking. February 2006 notes from Caribbean Pain Clinic indicate that Rivera's pain was a nine out of ten. It was constant, increased with touch, and affected her sleep, appetite, physical activity, concentration, emotions, and social relationships. An electrodiagnostic test performed on March 29, 2006, rendered normal results, with no evidence of lumbosacral radiculopathy or peripheral neuropathy. Medications (Neurontin, Cymbalta, and B12 injections) were prescribed. Tr. 298-299, 356-357. Rivera underwent an infiltration in her lower back at the pain clinic in June 2006, and August and September 2014. Tr. 684-688.

On October 2, 2015, Rivera, then 45 years old, reported feeling constant pain in her neck and upper back and limitations in her range of motion ("ROM") because of a muscle spasm. Her pain worsened with certain movements and radiated to her head. She had tried several medications which only brought her partial relief. She was taking Cymbalta and Lyrica for fibromyalgia at the time. On examination, Dr. López noted that she walked unassisted. Rivera had soft tissue swelling and tenderness to palpation in the cervical muscle area. Neck ROM was limited.  ROM, muscle strength, and muscle tone in her upper extremities were normal. Dr. López diagnosed cervicalgia and myalgia. Physical therapy and Flexeril were prescribed. Tr. 301-304, 333-336.

During her first physical therapy session on October 8, 2015, Rivera reported that her neck and upper back pain level was a ten on a scale of ten and complained of severe pain on deep palpation. She had a moderate muscle spasm in both the upper trapezius and dorsal paravertebral area and mild inflammation in the dorsal area. Her ROM was limited. Goals included "[l]ong-term and short-term goals to diminish pain, muscle spasms, inflammation and perform ROM." Tr. 305-307. In her final session on October 28, Rivera reported that she still felt a pain level of ten out of ten. Notes indicate that Rivera felt moderate pain instead of severe pain on deep palpation in the cervical/dorsal area, and continued having a moderate muscle spasm in both the upper trapezius and dorsal paravertebral area and mild inflammation in the dorsal area. Her ROM was functional with pain. The assessment portion states that "[t]here is no evidence of significant improvement regarding established goals." Tr. 340-341.

In November 2015, Rivera reported to Dr. López that physical therapy gave her partial pain relief and improved her neck and shoulder movements, and that she visited the rheumatologist Dr. López recommended (Dr. Dennis Suárez at Tr. 313-319, summarized below), who changed the muscle relaxant to Norflex along with migraine medication. Notes indicate that a cervical spine x-ray revealed normal findings. On examination, Rivera exhibited soft tissue swelling of the cervical muscles and upper trap, tenderness to palpation of the cervical paravertebral muscles and upper trapezium, and a muscle spasm. Upper extremities ROM and muscle strength, tone, and stretch reflexes were normal. Neck ROM was full but with tight end feel. Dr. López diagnosed again cervicalgia and myalgia and prescribed more medications and physical therapy. Tr. 343-345.

During physical therapy on November 16, 2015, Rivera's pain level was a seven out of ten. On her right side, Rivera felt neck pain and severe pain on deep palpation in the cervical/dorsal, moderate dorsal paravertebral muscle spasm. Her neck ROM was functional with pain. Tr. 346-348. On December 9, Rivera reported less neck pain, with a pain level of four out of ten. Her neck ROM was functional without pain. She also felt mild pain on deep palpation in the cervical/dorsal right side, mild dorsal paravertebral muscle spasm in her right side, and Rivera "was able to partially diminish pain and muscle spasm, and increase ROM without pain." Tr. 349-351.

On December 14, 2015, Rivera reported to Dr. López that physical therapy provided good pain relief and improved her neck ROM. She now felt pain in the dorsal aspect of both feet. On examination, Dr. López found no tenderness to palpation, mild residual muscle spasm in the right upper trap, and normal ROM and muscle strength, tone, and stretch reflexes in the upper

extremities, and full neck ROM without pain. Medications (Flexeril and Voltaren) were prescribed. Tr. 352-354.

**Dr. Alfredo Pérez-Canabal (neurologist)**

In 2009, Dr. Pérez referred Rivera to physical therapy for complaints of pain in the lumbar area, pain and a burning sensation in both legs, difficulty walking, and numbness in her hands. Tr. 230, 293. A March 2009 electromyographic examination of Rivera's upper extremities suggested early bilateral carpal tunnel syndrome, and bilateral radiculopathy in her lower extremities. Tr. 668-669.

Physical therapy notes for ten sessions between April and May 2009 indicate that Rivera had moderate muscle spasms and limited ROM in the torso. She felt pain in the lumbosacral area ranging seven to nine on a pain scale of ten and moderate to mild pain and numbness in both hands. These limited her ability to bend, walk long distances, climb stairs, push, pull, grab, and carry. Climbing stairs, lifting heavy objects, and pushing a shopping cart worsened the symptoms. Rivera perceived that the symptoms interfered with work and her ability to perform tasks. Goals to decrease pain and increase ROM were partially achieved, and Rivera still had moderate difficulty walking and some difficulty turning around, bending, and climbing stairs Tr. 224-232, 670-678.

Other progress notes in the transcript are dated between 2015 to 2018 and, unfortunately, the handwriting is mostly illegible. Tr. 292-295, 754-758, 841-842, 845-847, 913-914, 937-939.

**Dr. Denise Caro-Martínez (endocrinologist)**

A thyroid sonogram performed on January 2013 revealed a normal size thyroid with a stable right lobe small solid nodule. Tr. 679-680.

**Dr. Oscar Vargas (hand surgeon)**

Rivera consulted Dr. Vargas in February and March 2014 for dorsal wrist pain and pain in the basal joints of both thumbs. Dr. Vargas injected her joints several times but the pain recurred. Prognosis was guarded. No surgery was recommended at the time since Rivera had not returned for follow-up appointments. Dr. Vargas opined that Rivera probably had problems lifting. Tr. 682, 775-776. Hand x-rays showed normal findings. Tr. 683.

May 2017 and January 2018 notes contain diagnostic codes for unilateral primary osteoarthritis of first carpometacarpal joint in both hands. Rivera was injected. Tr. 942-944. A January 2018 x-ray showed periarticular osteopenia of both hands with degenerative changes in

the distal interphalangeal joints of the fifth fingers and the first carpometacarpal joints of both hands. Tr. 936, 945.

**Dr. Carlos Pérez-Cardona (orthopedic surgeon)**

In April 2015, Rivera consulted Dr. Pérez for right shoulder and right foot pain. A right foot x-ray from January 2015 showed osteopenia and minimal osteoarthritic changes. Tr. 258, 689. A March 2015 right shoulder MRI showed a small glenohumeral joint effusion and no internal derangement. Tr. 265, 689. Dr. Rivera assessed chronic right shoulder pain and right trapezius myositis. Medications and a shoulder injection were prescribed. Tr. 689-693. This record also contains a May 2014 evaluation which is handwritten and illegible. Tr. 694.

An April 2016 right shoulder x-ray revealed no abnormalities. Tr. 957. A March 2017 right foot x-ray showed a small superior calcaneal spur and early inferior calcaneal spur formation. Tr. 956.

**Dr. Dennis Suárez-Canabal (rheumatologist)**

The record contains handwritten treatment notes and reports dated from October 30, 2015 to February 2018. Tr. 20-31, 313-319, 781-794 889-912, 946-955, 974-977. Dr. Suárez noted in October 2015, February 2016, May 2017, and February 2018 that eighteen out of eighteen positive tender points were tender on physical examination. Tr. 64, 317, 909, 947, 976.

Dr. Suárez reported on June 13, 2016 in a two-page questionnaire that he treated Rivera from October 30, 2015 to June 3, 2016, for fibromyalgia. Rivera had a history of widespread pain that had persisted for at least three months, had at least eleven positive tender points on physical examination, found bilaterally and both above and below the waist, and other disorders that could cause the symptoms were excluded. Tr. 889-890.

In another report dated February 15, 2018, Dr. Suárez indicates that Rivera was diagnosed with fibromyalgia, plantar fascial fibromatosis, trochanteric bursitis in both hips, dysthymic disorder, long term use of non-steroidal anti-inflammatories, and raised antibody titer. All eighteen fibromyalgia tender points were tender bilaterally. Rivera had severe persistent pain, ROM limitations, and morning stiffness that lasted a couple of hours. Her subjective complaints included pain in her neck, shoulders, chest, upper and lower extremities, hands, knees, ankles and plantar heels. Medications were prescribed. Tr. 974-977.

**Podiatric surgeons**

Notes from December 2016 and March 2017 indicate Rivera had a small calcaneal spur and plantar medial heel pain. Medications were prescribed. Tr. 915-916.

**Dr. Adalgisa Suriel-Genao (obstetrician/gynecologist)**

Notes from January 2016 have diagnostic codes for hypothyroidism and asymptomatic premature menopause. Tr. 844, 871. An October 12, 2018, bilateral sonomammography showed some simple and complex cysts, probably benign but that should be followed-up. Tr. 19.

*Treating Physicians - Mental*

**San Juan Capestrano Hospital**

From June 13 to 23, 2015, Rivera was partially hospitalized for major depression, severe, recurrent. Upon admission, Rivera complained that the pain was annoying. Fibromyalgia and carpal tunnel syndrome were listed as Axis III factors. Her GAF score was 40. On mental examination, Rivera was cooperative and her mood sad. She was oriented in person, time, and place. Her appearance, attention, concentration, intellectual functioning and abstraction, memory, and verbal expression were adequate. Her thoughts were logical, coherent, and relevant. Her judgment was fair and her insight, superficial. The evaluation form has check-marked that Rivera's anxiety levels were affecting her family and work functioning and her sleep pattern. Tr. 276-283.

Discharge notes indicate that Rivera accepted and learned about her condition and demonstrated commitment and actively started working on her recovery process. Rivera was able to increase attention/concentration periods, recognized alternatives to improve communication, socialized more frequently and tolerated group activities, performed relaxation techniques, and learned strategies to manage stress and frustration. Rivera was also prescribed medications. Her GAF score at discharge was 60. Tr. 271-275.

**Dr. Jorge Valentín-Flores (psychiatrist)**

After hospitalization, Rivera continued treatment with Dr. Valentín. Tr. 272. The initial psychiatric evaluation, dated September 21, 2015, indicates that Rivera was oriented, with diminished attention, concentration, and memory. Her intellectual functioning was adequate; her thought process was logical, coherent, and relevant; her insight was superficial; and her judgment was fair. Her affect was restricted. Rivera was diagnosed with major depressive disorder, severe, recurrent, with a guarded prognosis. Medications were prescribed. Tr. 285-286.

Dr. Valentín's quarterly notes from November 2015 through June 2017 indicate that Rivera was alert, oriented, and logical. Rivera stated being in pain, feeling depressed and anxious, and having short-term memory problems and panic attacks. She was having marital issues and felt that her husband lowered her self-esteem. Prognosis was guarded. Medications were still being prescribed. Tr. 287, 361-369.

In February and September 2018, Dr. Valentín diagnosed Rivera with major depressive disorder, recurrent, severe with psychotic symptoms and without psychotic features. Medications were prescribed. Notes indicate that Rivera had a history of degenerative disc disease, gastrointestinal condition, hypertension, migraines, and depression. She was very anxious, had migraines and body ache, and could not concentrate. She was given "Education Handouts" regarding hospitalization, sleep hygiene, use of conventional medication, and suicidal risk management. Tr. 44-47, 379-381.

**Cognitive Wellness Clinic (psychologists)**

Rivera also received psychological treatment at the Cognitive Wellness Clinic from July 2015 to 2018 for major depressive disorder, recurrent severe without psychotic features. According to Dr. Lydia Pérez, as of February 2018, "we understand there are multiple medical conditions that are worsening the symptoms of the diagnosis." Tr. 370.

July 2015 notes indicate that Rivera's mood was depressed. She was cooperative, coherent, and oriented in time, place, and person. Her attention and judgment were adequate, her thought process and speed were organized, and her memory intact. Among her concerns were that fibromyalgia had been ruled out after multiple medical treatments, and she suffered from osteopenia and migraines. Notes indicate "[e]pisodes of migraine; she has functioning disability due to these episodes." Individual psychotherapy was recommended. Tr. 312.

During August to November 2015, Rivera talked with her therapist about medical, family, and spousal history and issues. Tr. 310-311. Rivera was stressed, felt forgetful, and worried about physical limitations, such as trying to separate heavy tasks from light ones, feeling electric shock in her fingers when using clips while hanging clothes, and having days where the pain impedes her from doing anything. She reported having an anxiety attack which she sat out and distracted herself until it was gone. During this time period, the therapist worked with Rivera on relaxation techniques, strategies to help with her memory, such as using sticky notes, listening to classical music, and doing word search puzzles, and physical task management, such as adapting tasks

according to her physical limitations and placing a family task board. Tr. 309-311, 332. Notes from July 2015 indicate that her migraine episodes caused functioning disability. Tr. 312.

During January, March, May, and June 2016, Rivera reported worsening of her physical symptoms. Rivera was depressed and anxious and was provided with strategies to emotionally empower her within her physical limitations and to adapt to these limitations, assertively communicate with her family as to house chore responsibilities and spousal difficulties. Rivera was oriented in time, space, and person. Her attention was adequate. Her language was spontaneous, and her thought process and speed were coherent. She had no suicidal or homicidal ideas. Tr. 374-377.

In January, April, June, August, and October 2017, Rivera continued being depressed and anxious. She was oriented in time, space, and person. Her language, thought process, and speed were coherent. She was not suicidal or homicidal. In April, Rivera was inattentive and her memory was diminished. In June, Rivera felt disoriented. In October, Rivera reported "forgetting things" and "[w]e noticed that her mood affects her attention, concentration and the connection to the present moment." (Tr. 372). Rivera stated being focused on decluttering at home and helping her daughter, and therapy focused on helping her redefine her purpose in life and work on her daily goals regarding health and her spousal relationship. She was provided with strategies for relaxation, mindfulness, memory and concentration stimulation, managing anxiety and resistance to change, and spousal conflict resolution. Rivera continued taking painting classes which helped her relax. Rivera was receptive during the sessions. Tr. 371-373, 384, 386.

Progress notes from February 2018 shed light as to her treatment continuity: "We explored recent experiences and mood because the patient was not attending her appointments since 2017. The patient is highly anxious. We worked on mood stabilization, management of emotions and strategies. Patient was receptive." Tr. 383. Rivera felt irritable and aggressive, and expressed feeling regrets. She wanted to be independent but her pain impeded her. She was also having marital issues. Rivera was cooperative, coherent, and oriented in time, space, and person. As to attention, Rivera was distracted. Her judgment was adequate. Her though process and speed were logical, her mood was depressed. Her affect was anxious and congruent. Rivera did not have suicidal or homicidal ideas. Tr. 382-383. Notes point to Rivera's physical symptoms and limitations affecting her emotional condition: "Strategies of managing physical limitations were explored. Patient was able to integrate some strategies discussed in therapy. However, we found

out that the patient is experiencing episodes of physical symptoms. Symptoms are worsening and her mood is depressive. We worked on strengthening strategies to manage mood and physical symptoms." Tr. 382.

In August 2018, the attending psychologist noted that Rivera had difficulty concentrating in one subject and that her immediate memory was affected. Treatment was focused on promoting well-being and mood management, and adapting to her physical limitations. Tr. 385.

### Procedural History

Rivera applied for disability insurance benefits on September 17, 2015. Tr. 54, 511. An in-person agency interviewer noticed Rivera had difficulty sitting and complained about back and hand pain. Tr. 531-532.

On October 8, 2015, Rivera reported that she felt constant pain, inflammation, and/or numbness in her hands, legs, neck, and back. Rivera claimed that she could only lift three pounds, squat for approximately ten minutes, bend for one minute, stand for thirty minutes, reach up to 4.5 feet high, and climb stairs with pauses. She could walk for thirty minutes before needing to stop and rest and had to rest for ten minutes before resuming walking. Her hand limitations limited her ability to self-care, cook, write, and use a computer. She felt desperate, anxious, and depressive. She had difficulty reading, remembering (would forget important information), concentrating (would lose her train of thought), and completing tasks. She could pay attention for about two hours. She had to constantly reread written instructions because she would forget them and would forget spoken instructions in a few days. She used medications and prescribed aids such as hot pads, glasses, and a wrist brace every night in both hands. She needed to be reminded to take her medications. She felt drowsy due to insomnia. Rivera handled stress by pausing, drinking water, and taking a deep breath. She handled changes in her routine by establishing priorities. Tr. 198-205.

Rivera also got headaches approximately once a week, which lasted two to three days. The pain was acute and caused intolerance to light and noises, nausea, vertigo, pulsing, stabbing pain, blurry vision, and a burning sensation in her eyes. When Rivera had a headache, she had difficulty writing and concentrating when reading, interpreting, and organizing documents. They made her irritable.  Her headaches were worsened by noises, light, stressful situations and tension, and exposure to strong smells like perfumes, detergents, and food. She treated her headaches by taking

medications, avoiding noise, turning off lights, lying down and applying cold compresses. Tr. 206-207.

Rivera's home routine included getting up early and making breakfast, getting dressed, taking care of her daughter and pet, taking her daughter to school, going to medical appointments or physical therapy, and performing house chores and listening to music. Rivera could go out alone, drive, run errands like shopping, and handle money. Her hobbies included watching television, listening to music, painting, going to the beach, and making handcrafts and sewing when her conditions allowed. She would also take her daughter to see family, to school, to the movies, and to church. Chores included making the beds daily, doing laundry at least twice a week, cleaning the kitchen area daily for around two hours, and cleaning the bathroom once a week for a couple of hours by spraying detergent and rinsing it. She needed help doing chores with tasks such as washing pots and the stove, opening jars and cans, scrubbing the bathroom, carrying bags of clothes to the laundry area, hanging clothes to dry or placing them in the dryer, and carrying heavy things. Her hand, shoulder, and neck pain made it difficult for Rivera to iron clothes and do yard work such as holding the hose nozzle and washing heavy pots. Her husband, sisters, and parents would help her at times. Rivera had no issues getting along with family or authority figures. Tr. 199-204.

The case was referred to Dr. Armando Caro, consultative psychiatrist, who diagnosed on November 25, 2015, major depressive disorder, moderate, and a pain disorder associated to general medical conditions. GAF score was 50-55. Dr. Caro observed that Rivera made good eye contact and her speech was fluent, coherent, and logical. She was oriented in time, place, and person. She showed no flight of ideas or looseness of associations. Her mood was neutral and her affect was appropriated. She denied having suicidal/homicidal ideation or auditory/visual hallucinations. Her concentration was fair (she was not able to subtract seven from a hundred five times but was able to spell "MUNDO" backwards). Her short-term memory was impaired (she recalled two or three unrelated objects at five minutes). Her recent and remote memory and her abstract thinking were preserved. Judgment and insight were fair. Rivera was able to handle funds. Her prognosis was poor based on her physical condition. Tr. 327-330.

Dr. Nilma Rosado, consultative internist, evaluated Rivera on December 1, 2015, and assessed that Rivera had muscle spasms and carpal tunnel syndrome. Dr. Rosado observed no hand limitations, or limitations sitting, standing, or getting up and down from the examination table.

Gait was normal. Upper and lower extremities were normal. Neurological exam was normal. Rivera achieved general ROM, including in her shoulder area. Seven out of the eighteen fibromyalgia tender points were tender on examination. Straight leg raise test was negative. Rivera was able to open the door, grip, grasp, pinch, finger tap, oppose fingers, button a shirt, and pick, up a coin. Cervical spine and right shoulder x-rays were normal, and the lumbosacral spine x-ray showed sacralization of L5, well-preserved disc spaces, and normal alignment, development, and bony structures. Tr. 827-840.

Dr. Luis Umpierre, State agency non-examining psychologist, evaluated the medical record and assessed that Rivera's mental condition was mild and non-severe. Treatment had been erratic but with a good response.  Under "B" Criteria Listing 12.04 – Affective Disorders, Rivera had mild restrictions of activities of daily living; mild difficulties in maintaining social functioning; mild difficulties in maintaining concentration, persistence, or pace; and no repeated episodes of decompensation, each of extended duration. The evidence did not establish the presence of "C" criteria. Tr. 398-400.

Dr. Rafael Queipo, State agency non-examining internist, evaluated the record under Listing 1.04 – Spine Disorders, and assessed that the evidence supported the existence of a severe medical condition but did not support the limitations as alleged. Dr. Queipo assessed the following RFC (based on an 8-hour day). As to exertional limitations, Rivera could occasionally (cumulatively one-third or less) lift and/or carry (including upward pulling) twenty pounds and ten pounds frequently (cumulatively more than one-third up to two-thirds), stand and/or walk with normal breaks for about six hours; sit with normal breaks for more than six hours on a sustained basis, and push and/or pull (including operation of hand and/or foot controls) unlimitedly. As to postural limitations, Rivera could frequently climb ramps/stairs but occasionally climb ladders/ropes/scaffolds. She could frequently balance, stoop (bend at the waist), and kneel. She could occasionally crouch (bend at the knees) and crawl. The only manipulative limitation she had was in handling (gross manipulation); she could unlimitedly reach in any direction, including overhead, finger (fine manipulation), and feel. Rivera had no visual, communicative, or environmental limitations. Tr. 400-402.

The claim was initially denied at step four on December 21, 2015, with a finding that Rivera's limitations affected her ability to perform some work-related tasks, but that her limitations still allowed her to perform her previous job as a secretary. Tr. 189, 397, 403.

Rivera requested reconsideration. Tr. 430. During another in-person interview on January 26, 2016, the interviewer noticed no limitations but that Rivera complained about wrist pain. Tr. 531-532. In new disability and function reports, Rivera described worsening of symptoms and limitations and added new limitations. She couldn't lift, squat, bend, stand, reach, walk, sit, kneel, climb stairs, use her hands, concentrate, or complete tasks. She felt constant cramps, numbness, and inflammation in her hands, arms, neck, and joints. She had difficulty holding objects such as a stapler and a phone and writing.  She added sitting and kneeling, inability to pay bills because she would forget the dates to make payments, and could now only pay attention for less than an hour, but stated there were no changes to her daily activities; she had trouble falling asleep due to the pain and depression. Tr. 216-223, 579, 587.

Dr. Zulma Nieves, State agency psychologist, affirmed the initial assessment as written, finding no medical evidence in file to sustain significant worsening of Rivera's condition.  Tr. 415. Dr. Pedro Nieves also affirmed the initial assessment as written. Tr. 416, 876.

The claim was denied on reconsideration on March 8, 2016, with a finding that the initial determination denying benefits was correct according to the law. Tr. 193, 415, 422.

Rivera again claimed worsening of her conditions as of April 2016. Her hand and right shoulder pain were more frequent and hurt more and she was confused and forgetful more often. Tr. 608,635. Her daily activities changed in that she could not do activities that required her to raise her arms or use her hands, such as shaving, putting on a bra, washing her back, or holding a car's steering wheel. Tr. 615. A revised reconsideration determination (labeled as "informal remand" in the court transcript index) dated April 7, 2017, also concludes that Rivera was not disabled. It states that additional evidence submitted by Rivera's attorney was reviewed resulting in no changes to the previous RFC and mental RFC. Tr. 424-425.

At Rivera's request (Tr. 436), ALJ Livia Morales heard her case. On February 6 and June 25, 2018, Rivera video-testified that she was 48 years old, had a bachelor's degree, could not communicate in English, and worked from 2004 until August 22, 2014, as a receptionist and secretary at a doctor's office. She would open the office, set up appointments and register patients, answer the phone, and create and file records. The heaviest thing she would carry were several files at a time. She stopped working due to frequent migraine attacks, cervical muscle spasms, hand numbness and carpal tunnel condition. Her right hand was the dominant hand for writing, but she had more strength in her left hand which she used for cutting, ironing, washing, answering the

phone and driving. She could not carry the medical records and would hurt her sciatic nerve when bending, which led to limping and pain. Pain in her ankles started limiting her mobility. She could not concentrate, either, and would file records out of order. When she tried to return to work to that office in 2015, her job was no longer available, but she got another receptionist job from February to June 2015, which she resigned from due to her medical conditions. She could not take phone calls or write, and knew she wasn't meeting expectations. After that, she fell into a depression and had not worked since. Rivera was partially hospitalized from June to July 2015 at Capestrano Hospital and has continued treatment with a psychologist and a psychiatrist. Medications have helped her sleep and avoid migraine attacks due to lack of rest. She lacked motivation and lost concentration when doing something. An example of her problems concentrating was paying for gasoline and boarding the car without pumping in the gas.

Rivera also testified that she had difficulty sitting for long periods because of pain in her waist area, accompanied by numbness and cramps in her legs. When she turned, her pain intensified. She could sit continuously for no more than thirty minutes and asked to stand during the hearing. She could stand for thirty minutes. She could walk at most twenty minutes slowly. She could carry water bottles of 16-20 ounces, but not a half-gallon or gallon. She could move her arms in any direction with pain and could not reach above shoulder level or extend her arms forward. Medications prescribed by Dr. Suárez gave her a bit of blurry vision and mouth dryness.

Her muscle spasms in her neck area, back pain, and hand pain and swelling limited her ability to self-care (dress, brush her teeth, shower, fix her hair) and do chores. Her family helped her with chores like cleaning, sweeping, and doing laundry because she didn't have the strength to lift or open bottles. She would have to use both hands because she would suddenly feel a shock-like sensation and drop things. Dr. Vargas, hand surgeon, treated her with injections and had not yet referred her for surgery. Rivera got migraines two to three times a month, for which she took her medication and avoided exposure to smells, light, and noise. During those episodes, she would not drive because the light bothered her. Tr. 81-82, 163-181.

On June 25, 2018, vocational expert ("VE") Pedro Román testified that Rivera's job was composite, as a secretary and human resource clerk, both sedentary with an SVP of four. Tr. 82-83. The ALJ asked if a person with the same age, education, language skill, and jobs like Rivera could perform past work if she was limited to light work with the following additional limitations: climb ramps and stairs frequently but never climb ladders, ropes, or scaffolds; balance frequently;

stoop and kneel frequently; crouch and crawl occasionally; frequently handle with the bilateral upper extremities; could be exposed to moderate noise; and had to avoid  concentrated exposure to unprotected heights, moving mechanical parts, and operating motor vehicles. The VE answered that she could perform both jobs, individually or in combination, as she performed them. Tr. 83-84.

The ALJ then asked if such a person who additionally was limited to simple, routine tasks, could do past work. The VE answered that she could not, but could work as a cashier II, furniture rental consultant, or job pricing tagger/marker, all light with an SVP of two for which there existed 1,260,898; 100,849; and 311,457 positions, respectively. The VE clarified that these were examples and was not an exhaustive list. Tr. 84.

For the third hypothetical question, the ALJ added that such a person needed to change position between seating and standing without losing production. The VE answered that "the price tagger as well as cashier would have a 30% reduction" but that the furniture rent consultant allowed for a person to sit, stand, or walk at will. Tr. 84.

For the fourth hypothetical, the ALJ asked if such a person could work but at a sedentary level. The VE answered that a person that cannot speak or understand English could only do jobs in manufacturing or production, such as assembler, finisher, or final assembler, all sedentary with an SVP of two, for which only 24,932 of these jobs exist in the nation and many have been outsourced. Tr. 84-85. Counsel for Rivera added manipulative limitations to the fourth hypothetical: she could not reach above her shoulders at all, and could occasionally reach in any other direction, handle, and finger. The VE answered that she could not work because those sedentary jobs required frequent handling and fingering, with more reaching than mentioned in counsel's hypothetical question. The VE added that the only job that accepted occasional handling and fingering was operator, but it required the use of the English language. The ALJ followed-up by asking how much reaching was required, and the ALJ answered that the sedentary jobs mentioned required more than frequent reaching on a bench while assembling objects. The cashier and price tagger jobs required frequent to constant reaching; the furniture rental consultant, occasional reaching. Tr. 86-88.

Counsel also asked if, for any of the four hypotheticals, such a person could work if she were absent from work two to three times a month due to her conditions and symptoms. The VE answered that she could not because the maximum number of absences for unskilled work was

seven days a year and during the 90-trial day period a person could rarely be absent unless there was a major circumstance. Tr. 85-86.

The VE further testified that his testimony was consistent with the DOT, Selective Characteristics of Work, the rules and regulations of Social Security, and his own education and observations as a VE for twenty-seven years. Tr. 87.

On August 28, 2018, the ALJ found that Rivera was not disabled under sections 216(i) and 223(d) of the Act. Tr. 48, 54-69. The ALJ sequentially found that Rivera:

(1) had not engaged in substantial gainful activity since her alleged onset date of January 14, 2013 through her date last insured (Tr. 56);

(2) had severe impairments: cervical and lumbar spine disorder, spinal cord or nerve root lesions, inflammatory arthritis, fibromyalgia, and an affective disorder (Tr. 57);

(3) did not have an impairment or combination of impairments that met or medically equaled the severity of an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526) (Tr. 58);

(4) retained the RFC to perform light work as defined in 20 C.F.R. 404.1567(b) with the following limitations: needed to change position between sitting and standing at will without loss of production; could frequently climb stairs and ramps but never ladders, ropes, or scaffolds; could frequently balance, stoop, and kneel but occasionally crouch and crawl; could frequently handle with both upper extremities; and should avoid concentrated exposure to unprotected heights, moving mechanical parts, and operating a motor vehicle; could be exposed to moderate noise. Rivera could perform simple and routine tasks. Additionally, time off task could be accommodated for 3% of an 8-hour day, or 15 minutes, in addition to normal breaks. Therefore, Rivera could not perform past relevant work (Tr. 60, 67); but

(5) as per her age, education, work experience, and RFC, there were jobs that existed in significant numbers in the national economy that Rivera could perform (such as cashier II, price tagger/marker, and furniture rental consultant). Tr. 67-68.

The ALJ specified that the cashier II and price tagger/marker jobs had an erosion of the number of positions available in the national economy of 30% to account for the sit/stand option. Tr. 69.

The ALJ considered the medical record, Rivera's subjective complaints, as well as listings 1.02, 1.04, 11.03, 11.08, 12.04, and 14.09; Section 4.00; SSR 12-2p for fibromyalgia; and SSR 02-

1p for obesity. Tr. 58-61. The ALJ found that Rivera's hypertension, migraines, right shoulder osteoarthritis, right fool calcaneal spur, bilateral hip bursitis, and obesity were non-severe impairments. As to Rivera's hypertension, her blood pressure was within normal limits or only slightly elevated, and the record had mild to no findings related to this condition. Migraines were handled with medications with reported relief after dosing. Shoulder imaging studies were normal. Rivera had normal shoulder and hip ROM. And Rivera's right foot issues did not affect her gait. The ALJ considered Rivera's obesity in the RFC assessment. Tr. 57-58.

As to Rivera's mental impairment, the ALJ found that the "paragraph B" and "paragraph C" criteria of listing 12.04 were not satisfied. Rivera had moderate limitation in her ability to understand, remember, or apply information; mild limitation in getting along with others; moderate limitations concentrating, persisting, or maintaining pace; and mild limitation in her ability to adapt and manage oneself. Tr. 58-60.

The ALJ gave little weight to treating physician Dr. Camacho's opinion that Rivera could not work because it was conclusory and inconsistent with other findings. The ALJ gave partial weight to treating physician Dr. Vargas's opinion that Rivera likely had problems lifting due to bilateral hand pain, which was consistent with other evidence in the record but lacked specific weight limitation. The ALJ gave little weight to treating psychologist Dr. Pérez's opinion (from the Cognitive Wellness Clinic) that migraines incapacitated her because that assessment was out of her specialty in psychology and is not supported by the record. The ALJ gave partial weight to the State agency medical consultants' RFC assessment. The ALJ adopted the limitations found by them but added greater restrictions to account for Rivera's subjective complaints of pain. The ALJ gave partial weight to consultative psychiatrist Dr. Caro because he did not provide specific functional limitations, and little weight to the State agency psychologists who determined that Rivera did not have a severe mental impairment.  Tr. 65-67.

Rivera requested review of the ALJ's decision (Tr. 509), and on June 22, 2019, the Appeals Council denied Rivera's request for review, rendering the ALJ's decision the final decision of the Commissioner. Tr. 6. The present complaint followed. ECF No. 1.

## DISCUSSION

This court must determine whether there is substantial evidence to support the ALJ's determination at step five in the sequential evaluation process that based on Rivera's age,

education, work experience, and RFC, there is work in the national economy that she could perform, thus rendering her not disabled within the meaning of the Act.

Rivera argues that the ALJ (1) erred at step three by not finding she had an impairment or combination of impairments that met or medically equaled the severity of the impairments under listing 1.04 for spine disorders and listing 12.04 for mental disorders, (2) improperly assessed Rivera's fibromyalgia throughout the sequential evaluation process, (3) did not afford the correct weight to the medical opinions and instead interpreted the raw medical data as a lay person, (4) did not properly assess Rivera's impairments when determining her RFC and capability to work, and should have found that a sedentary RFC was more suitable, and (5) erred by misinterpreting the VE's answers to the hypothetical questions.

The ALJ is required to express a claimant's impairments in terms of work-related functions or mental activities, and a VE's testimony is relevant to the inquiry insofar as the hypothetical questions posed by the ALJ to the VE accurately reflect the claimant's functional work capacity. *Arocho v. Sec'y of Health and Human Services*, 670 F.2d 374, 375 (1st Cir. 1982). In other words, a VE's testimony must be predicated on a supportable RFC assessment. *See* 20 C.F.R. § 404.1520(g)(1). An RFC assessment is "ultimately an administrative determination reserved to the Commissioner." *Cox v. Astrue*, 495 F.3d 614, 619 (8th Cir. 2007) (*citing* 20 C.F.R. §§ 416.927(e)(2), 416.946). But because "a claimant's RFC is a medical question, an ALJ's assessment of it must be supported by some medical evidence of the claimant's ability to function in the workplace." *Id.* Also, when determining which work-related limitations to include in the hypothetical question, the ALJ must: (1) weigh the credibility of a claimant's subjective complaints, and (2) determine what weight to assign the medical opinions and assessment of record. *See* 20 C.F.R. §§ 404.1527, 404.1529. A claimant is responsible for providing the evidence of an impairment and its severity; the ALJ is responsible for resolving any evidentiary conflicts and determining the claimant's RFC. 20 C.F.R. § 404.1545(a)(3); *see also Tremblay v. Sec'y of Health & Human Servs.*, 676 F.2d 11, 12 (1st Cir. 1982) (*citing Richardson v. Perales*, 402 U.S. 389 (1971)).

First, Rivera raises in her memorandum at ECF No. 14, page 13, a skeletal claim that the ALJ erred at step three by discarding listings 1.04 and 12.04, without discussing what evidence in the transcript on file at ECF No. 8 supports her claim. This is insufficient. *See United States v. Zannino*, 895 F.2d 1, 17 (1st Cir. 1990) ("It is not enough merely to mention a possible argument

in the most skeletal way, leaving the court to do counsel's work, create the ossature for the argument, and put flesh on its bones."). Nonetheless, I will address this claim because the evidence that supports the ALJ's finding at step three also substantially supports the ALJ's RFC assessment.

At step three, the ALJ asks whether a claimant's impairment or impairments are equivalent to one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. 20 C.F.R. § 404.1520(a)(4)(iii). If so, the claimant is conclusively found disabled. 20 C.F.R. § 404.1520(d). A claimant bears the burden to show that her impairment meets or equals a listing. *Torres v. Sec'y of Health & Human Servs.*, 870 F.2d 742, 745 (1st Cir. 1989). "For a claimant to show that his impairment matches a listing, it must meet *all* of the specified medical criteria. An impairment that manifests only some of those criteria, no matter how severely, does not qualify." *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990), *superseded by statute on other grounds as stated in Kennedy v. Colvin*, 738 F.3d 1172, 1174 (9th Cir. 2013) (emphasis in original).

Listing 1.04 addresses disorders of the spine. In order to satisfy listing 1.04, a claimant must suffer a "[d]isorder[] of the spine (e.g., herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture), resulting in compromise of a nerve root (including the cauda equina) or the spinal cord." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.04. Additionally, the claimant must show one of the following three:

Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine). 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.04(A); or

Spinal arachnoiditis, confirmed by an operative note or pathology report of tissue biopsy, or by appropriate medically acceptable imaging, manifested by severe burning or painful dysesthesia, resulting in the need for changes in position or posture more than once every 2 hours. 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.04(B); or

Lumbar spinal stenosis resulting in pseudoclaudication, established by findings on appropriate medically acceptable imaging, manifested by chronic nonradicular pain and weakness, and resulting in inability to ambulate effectively, as defined in 1.00B2b. 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.04(C).

It is undisputed that Rivera suffered from a severe cervical and lumbar spine disorder, as found by the ALJ at step two. The record shows that she regularly sought treatment for back pain and that her spine disorder imposed some limitations on her capacity to do physical activities, but Rivera did not show that her spinal conditions met the medical criteria for listing 1.04. After

reviewing the record, I find that the ALJ correctly concluded at step three that "[n]o treating or examining physician has recorded findings equivalent in severity to the criteria of any listed impairment, nor does the evidence show medical findings that are the same or equivalent to those of any listed impairment." Tr. 58. MRIs of the lumbosacral spine did not show nerve root or spinal cord compression, spinal arachnoiditis, or lumbar spinal stenosis resulting in pseudoclaudication. One lumbosacral MRI from August 2014 even stated that the imagining of the lumbosacral spine was "unremarkable." Cervical spine x-rays were normal. Also, as pinpointed by the ALJ at Tr. 61, Rivera's statements regarding difficulty standing and walking for more than thirty minutes due to low back pain and leg pain and numbness are inconsistent with the medical evidence. There was no evidence that Rivera had sensory or reflex loss or inability to ambulate effectively (although the ALJ did find that Rivera needed to change positions between sitting and standing at will). In October 2015, Rivera's treating physiatrist Dr. López noted that Rivera walked unassisted. Dr. Rosado, consultative internist, noted in December 2015 that Rivera's gait was normal and the straight leg raise test was negative. Accordingly, substantial evidence supports the Commissioner's finding that Rivera does not have an impairment or impairments that meet or equal listing 1.04.

As to Rivera's mental impairment, the ALJ found at step three that the "paragraph B" and "paragraph C" criteria of listing 12.04 were not satisfied. Listing 12.04 (depressive, bipolar, and related disorders) has three paragraphs, designated A, B, and C. A claimant's mental disorder must satisfy the requirements of both paragraphs A and B, or both A and C. *See* 20 C.F.R., Pt. 404, Subpt. P, App. 1, 12.00 Mental Disorders.

While not mentioned in the ALJ's decision, listing 12.04 paragraph A for a depressive disorder requires medical documentation of at least five of the listed characteristics (depressed mood, diminished interest in almost all activities, appetite disturbance with change in weight, sleep disturbance, decreased energy, feelings of worthlessness, and difficulty concentrating or thinking), which in Rivera's case are documented throughout the record. 2015 records from San Juan Capestrano, treating psychiatrist Dr. Valentín, and consultative psychiatrist Dr. Caro indicate that Rivera was diagnosed with major depression. Rivera had a depressed mood, sleep disturbances, and diminished attention, concentration, and memory.

To satisfy the paragraph B criteria, a claimant's disorder must result in an extreme limitation of one area, or marked restrictions in two of the following areas: activities of daily living; maintaining social functioning; maintaining concentration, persistence, or pace; or repeated

episodes of decompensation, each of extended duration. The ALJ determined that Rivera had moderate limitation in her ability to understand, remember, or apply information; mild limitation in getting along with others; moderate limitations concentrating, persisting, or maintaining pace; and mild limitation in her ability to adapt and manage oneself. Tr. 58-60.  Moderate functioning means that a claimant can fairly carry out the activity independently, appropriately, and effectively, and on a sustained basis, unlike a marked limitation which means that the claimant is seriously limited in functioning in that area. Extreme limitation is when a claimant is unable to function independently, appropriately, and effectively, and on a sustained basis.  To satisfy the paragraph C criteria, a claimant must show that she had a "serious and persistent" disorder that lasted over a period of at least two years and that she relied on ongoing medical treatment to diminish the symptoms and have only achieved marginal adjustment. 20 C.F.R., Pt. 404, Subpt. P, App. 1, 12.00 Mental Disorders.

Rivera additionally argues that as per SSR 85-15, the ALJ needed to assess how her mental limitations affected her ability to be punctual, attend work regularly, accept supervision, or remain in the workplace all day. A claimant seeking disability benefits based upon mental illness must establish that it impedes her from performing the basic mental demands of competitive remunerative unskilled work on a sustained basis, that is: (1) understand, carry out, and remember simple instructions; (2) respond appropriately to supervision, coworker, and usual work situations; and (3) deal with changes in a routine work setting.  *Ortiz*, 890 F.2d 520, 526 (1st Cir. 1989) (*quoting* SSR 85-15).  For a claimant to understand, carry out, and remember simple instructions in any job, she must have the mental ability to remember very short and simple instructions, and the "ability to maintain concentration and attention for extended periods (the approximately 2-hour segments between arrival and first break, lunch, second break, and departure)."  SSA's Program Operations Manual System ("POMS") DI 25020.010(B)(2)(a).  "Concentration, persistence, or pace refers to the ability to sustain focused attention and concentration sufficiently long to permit the timely and appropriate completion of tasks commonly found in work settings."  20 C.F.R. Pt. 404, Subpt. P, App. 1, §12.00(C)(3).

In reviewing for substantial evidence, I find that the records for her treating psychologists and those of the consultative and non-examining experts contain substantial evidence that Rivera did not meet the step three standard and that she could perform simple and routine tasks. Rivera's mental condition was secondary to her physical conditions, especially fibromyalgia, all of which

could be painful and debilitating and worsened her emotional symptoms as noted at the Cognitive Wellness Clinic. Pain provoked her emotional state. Treating records as well as consultative psychiatrist Dr. Caro's evaluation indicate that Rivera had difficulty concentrating and that her memory was diminished, but not to the degree that she was unable or seriously limited in her ability to function independently, appropriately, effectively, and on a sustained basis. Her attention was adequate and her thought process was logical and coherent. Despite claims of lack of motivation, forgetfulness, and difficulty completing tasks, her home and errand-running routines were repetitive and she reported being able to complete them as long as her physical limitations allowed, which also supports the ALJ's RFC assessment that Rivera could perform simple and routine tasks.  Rivera self-reported having no issues getting along with family or authority figures, and she was cooperative and engaged during her appointments with her therapists and physicians. While treatment was not continuous, the record shows that Rivera also actively participated in her road to wellness, such as by practicing relaxation and physical task management techniques at home. I additionally note that the ALJ's Paragraph B finding is more restrictive than State agency psychologist Dr. Umpierre's assessment of mild difficulties in all areas. Rivera experienced no episodes of decompensation, each of extended duration.

Moving on to Rivera's next claim, Rivera argues that the ALJ did not meet the requirements of SSR 12-2p, improperly assessed Rivera's fibromyalgia in the RFC finding, and did not adequately incorporate its limiting effects into the hypotheticals. "Fibromyalgia is defined as [a] syndrome of chronic pain of musculoskeletal origin but uncertain cause." *Rodríguez v. Comm'r of Soc. Sec.,* 2021 U.S. Dist. LEXIS 70631, at *9 (D.P.R. Mar. 31, 2021) (internal citations omitted). The Commissioner has promulgated rules regarding the analysis of fibromyalgia claims, which lay out the general criteria to establish that a person has a medically determinable impairment of fibromyalgia. *See* SSR 12-2p, 2012 SSR LEXIS 1. The rules lay out the general criteria to establish that a person has a medically determinable impairment of fibromyalgia:

> Generally, a person can establish that he or she has a [medically determinable impairment] of [fibromyalgia] by providing evidence from an acceptable medical source. A licensed physician (a medical or osteopathic doctor) is the only acceptable medical source who can provide such evidence. We cannot rely upon the physician's diagnosis alone. The evidence must document that the physician reviewed the person's medical history and conducted a physical exam. We will review the physician's treatment notes to see if they are consistent with the diagnosis of [fibromyalgia], determine whether the person's symptoms have improved,

worsened, or remained stable over time, and establish the physician's assessment over time of the person's physical strength and functional abilities. *Id.* at *3-4.

More specifically, the rules provide that an individual will be found to have a medically determinable impairment of fibromyalgia where a physician diagnoses fibromyalgia and provides the evidence described in section II.A or section II.B of SSR 12-2p, 2012 SSR LEXIS 1. *Id.* at *4. The ALJ may conclude that fibromyalgia is a medically determinable impairment if the record contains evidence meeting all three criteria in either section II.A or section II.B. *Id.* at *5-9.

Under the criteria in section II.A the physician must provide evidence of:

1.      A history of widespread pain that has persisted (or that persisted) for at least 3 months. The pain may fluctuate in intensity and may not always be present.

2.      At least 11 positive tender points on physical examination. The positive tender points must be found bilaterally and both above and below the waist.

3.      Evidence that other disorders that could cause the symptoms or signs were excluded.

Alternatively, under the criteria in section II.B the physician must provide evidence of:

1.      A history of widespread pain that has persisted (or that persisted) for at least 3 months. The pain may fluctuate in intensity and may not always be present.

2.      Repeated manifestations of six or more fibromyalgia symptoms, signs, or co-occurring conditions, especially manifestations of fatigue, cognitive or memory problems ("fibro fog"), waking unrefreshed, depression, anxiety disorder, or irritable bowel syndrome.

3.      Evidence that other disorders that could cause these repeated manifestations of symptoms, signs, or co-occurring conditions were excluded.

*Id.* at *5-9.

At step two, the ALJ found that fibromyalgia was a severe impairment. Tr. 57. At step three, the ALJ stated having considered fibromyalgia as per SSR 12-2p in concluding that Rivera did not have an impairment or combination of impairments that met or medically equaled the severity of a listed impairment. Tr. 58. In assessing Rivera's RFC, the ALJ discussed the medical evidence as to fibromyalgia on record at Tr. 64, which I also note here for this substantial evidence review. Notes from Rivera's rheumatologist, Dr. Suárez, dated October 2015, February 2016, May 2017,

and February 2018, indicate that eighteen out of eighteen positive tender points were tender on physical examination. This contrasts with Dr. Rosado's December 2015 consultative examination, in which seven out of the eighteen fibromyalgia tender points were tender on examination. Dr. Suárez also reported in 2016 that Rivera had a history of widespread pain that persisted for at least three months and that other disorders that could cause the symptoms were discarded. The ALJ considered Rivera's pain when adding to the light work RFC assessment that Rivera needed to change position between sitting and standing at will without loss of production. Thus, the ALJ's analysis in this portion of the decision recognizes limitations from fibromyalgia in the RFC assessment and appears to give greater consideration to Dr. Suárez's lengthy record documenting Rivera's fibromyalgia condition.

The ALJ also points to other evidence in the record that further supports a finding of an RFC of light work. "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls." 20 C.F.R. § 404.1567(b). The ALJ added to Rivera's RFC that she could frequently climb stairs and ramps but never ladders, ropes, or scaffolds; could frequently balance, stoop, and kneel but occasionally crouch and crawl; and could frequently handle with both upper extremities. Continuing with evidence mentioned in the listing 1.04 analysis, while the 2009 record from Dr. Pérez indicates that Rivera had moderate muscle spasms, limited ROM in the torso, and difficulty walking, physical therapy was helping her decrease pain and increase ROM. The 2015 record from Dr. López, treating physiatrist, shows normal gait, ROM, muscle strength and muscle tone in her upper extremities, and although she felt pain and was receiving physical therapy for muscle spasm, the record shows that therapy was helping diminish the pain and increase ROM. Dr. Rosado's December 2015 examination contrasts with Rivera's testimony regarding her physical limitations. Dr. Rosado's report revealed that even with muscle spasms and carpal tunnel syndrome, Rivera's upper and lower extremities was normal, and Rivera achieved general ROM. Hand function was also normal. Rivera could use her hands to open the door, grip, grasp, pinch, finger tap, oppose fingers, button a shirt, and pick up a coin. Rivera acknowledged at the hearing that Dr. Vargas, hand surgeon, treated her with injections and had not yet referred her for surgery. That record shows that she consulted with Dr. Vargas twice and did not return for further evaluation. The only

opinion as to potential limitations offered by Dr. Vargas was that Rivera probably had problems lifting, which the ALJ took into account. The ALJ also took into consideration Rivera's obesity and migraine in adding that Rivera should never climb ladders, ropes, or scaffolds, and should avoid exposure to unprotected heights, moving mechanical parts, and operating a motor vehicle, but could be exposed to moderate noise. And, to account for the combined effect of physical and mental symptoms, the ALJ added time off task of 15 minutes in addition to normal breaks. As to Rivera's argument that her conditions would result in more than seven absences in a year, including during any probation period, the record does not support this claim.

Rivera's assertion that the ALJ should have found for a sedentary RFC and that the hypotheticals presented by the ALJ did not adequately depict all of her limitations is moot because Rivera has failed to show that the ALJ erred in arriving at the RFC. An ALJ's hypotheticals to a VE "should convey the claimant's limitations precisely in order to yield relevant responses." *Maldonado v. Sec'y of Health & Human Servs.*, 972 F.2d 337 (1st Cir. 1992); *see also Cooper v. Bowen*, 880 F.2d 1152, 1158 n.13 (9th Cir. 1989) (VE's testimony cannot "constitute substantial evidence to support an ALJ's determination as to a claimant's disability status unless it accurately reflects all the claimant's limitations"). For "a vocational expert's answer to a hypothetical question to be relevant, the inputs into that hypothetical must correspond to conclusions that are supported by the outputs from the medical authorities." *Arocho*, 670 F.2d at 375. But hypothetical questions need only "reasonably incorporate[] the disabilities *recognized by the ALJ*." *Velez-Pantoja* v. *Astrue* 786 F. Supp. 2d 464, 469 (D.P.R. 2010) (internal quotations omitted) (emphasis in original).

Rivera also argues that the ALJ, as a lay person, improperly substituted her own opinion for those of medical experts. This argument is without merit as well. The ALJ's duty is to weigh all of the evidence, resolve any evidentiary conflicts, determining the claimant's RFC, aand make certain that the ALJ's conclusion rested upon clinical examinations as well as medical opinions. 20 C.F.R. § 404.1545(a)(3); *Rodríguez v. Sec'y of Health & Human Servs.*, 647 F.2d 218, 224 (1st Cir. 1981); *Tremblay*, 676 F.2d at 12. The ALJ may not substitute her "own impression of an individual's health for uncontroverted medical opinion." In other words, an ALJ needs a medical expert to translate medical evidence into functional terms. *Vega-Valentín v. Astrue*, 725 F. Supp. 264, 271 (D.P.R. 2010). However, an ALJ may render a common-sense judgment regarding an individual's capacities, so long as he "does not overstep the bounds of a lay person's competence

and render a medical judgment." *Gordils v. Sec'y of Health & Human Servs.*, 921 F.2d 327, 329 (1st Cir. 1990).

It was therefore the ALJ's duty to weigh all the evidence and make certain that the ALJ's conclusion rested upon clinical examinations as well as medical opinions. *Rodríguez*, 647 F.2d at 224. "Medical opinions are statements from acceptable medical sources that reflect judgments about the nature and severity of [a claimant's] impairment(s), including [his or her] symptoms, diagnosis and prognosis, what [the claimant] can still do despite impairment(s), and [the claimant's] physical or mental restrictions." 20 C.F.R. § 404.1527(a)(1). Regulations provide that the opinion of a treating physician is presumed to carry controlling weight as long as it is well-supported by medically-acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in the record.  20 C.F.R. § 404.1527(c)(2). "[T]he regulations specifically exclude from consideration opinions on certain issues, such as conclusory statements that a claimant is disabled or unable to work." *Dunlap v. Commr. of Soc. Sec.*, 509 Fed. Appx. 472, 476 (6th Cir. 2012) (unpublished) (*citing* 20 C.F.R. § 404.1527(d)). Additionally, the determination whether a claimant is unable to work is reserved for the Commissioner. As discussed above in the RFC assessment analysis, the ALJ made a more restrictive RFC determination than that offered by any medical source based on the medical evidence on record and Rivera's subjective symptoms. After reviewing the record and the ALJ's decision, I conclude that the ALJ did not improperly replace the medical opinions with her lay opinion.

Lastly, Rivera questions if the total amount of available jobs in the national economy proposed by the VE constitutes "significant numbers" and argues that the Commissioner failed to meet the step five burden if she could not be expected to find one of the proposed jobs in her region or if she would potentially have to move to find a job. ECF No. 14, pages 17-19.[4] The Commissioner considers "that work exists in the national economy when it exists in significant numbers either in the region where you live or in several other regions of the country" regardless of whether "(1) work exists in the immediate area in which you live; (2) [a] specific job vacancy

---

[4] Rivera misinterprets the VE's testimony that the cashier and the price tagger positions had a 30% reduction, interpreting the testimony as having a 30% reduction or loss in production, leaving the furniture rental consultant job as the only option that Rivera could be performed. ECF No. 14, page 17. The ALJ asked the VE if the same jobs mentioned would hold if the hypothetical person needed to change positions at will without losing production. The VE's testimony referred to available positions in the national economy of each of those jobs (there'd be 30% fewer of the total positions to accommodate the need to change positions without losing production).

exists for you; or (3) [y]ou would be hired if you applied for work." 20 C.F.R. § 404.1566(a). Also, Rivera's argument that the total of 24,932 jobs available in the national economy for the positions of assembler, finisher, or final assembler do not constitute "significant numbers" has no merit because the VE's testimony regarding those positions referred to the hypothetical question for sedentary work. As already discussed, a RFC of light work with the additional limitations determined by the ALJ was appropriate, and the VE testified that there existed collectively 1,673,204 positions in the national economy for the jobs of cashier II, furniture rental consultant, and price tagger/marker minus the 30% reduction of available positions for the price tagger and cashier jobs to accommodate between sitting and standing at will. And, even if when referring to the sedentary jobs proposed by the VE, "[t]he judicial officer determines what constitutes a significant number of jobs." *Curtis v. Sullivan*, 808 F. Supp. 917, 926 (D.N.H. 1992) (*citing Martínez v. Heckler*, 807 F.2d 771, 775 (9th Cir. 1986)). *See Vining v. Astrue*, 720 F. Supp. 2d 126, 136-138 (D. Me. 2010) (*quoting Hall v. Bowen*, 837 F.2d 272, 275 (6th Cir. 1988) ("'[W]hen there is testimony that a significant number of jobs exists for which a claimant is qualified, it is immaterial that this number is a small percentage of the total number of jobs in a given area.'")

Ultimately, it is the Commissioner's responsibility to determine issues of credibility, draw inferences from the record evidence, and resolve conflicts in the evidence (*see Ortiz*, 955 F.2d at 769 (*citing Rodríguez*, 647 F.2d at 222; *Evangelista*, 826 F.2d at 141 (1st Cir. 1987)). After thoroughly and carefully reviewing the record, I find that there is substantial evidence to support the ALJ's RFC finding in this case.

## CONCLUSION

For the foregoing reasons, the Commissioner's decision is **AFFIRMED**.

**IT IS SO ORDERED.**

In San Juan, Puerto Rico, this 1st day of March, 2022.

*s/ Bruce J. McGiverin*
BRUCE J. McGIVERIN
United States Magistrate Judge
